# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MEGAN MCCULLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Case No. 09-CV-0310-CVE-PJC** |
| | ) |
| AMERICAN AIRLINES, INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Now before the Court is Defendant American Airlines, Inc.'s Motion for Summary Judgment & Brief in Support (Dkt. # 17). Plaintiff Megan McCully filed a Complaint (Dkt. # 2) alleging: disability discrimination in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA) and the Oklahoma Anti-Discrimination Act, OKLA. STAT. tit. 25, § 1101 et seq. (OADA); retaliation in violation of the ADA and OADA; interference in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA); retaliation in violation of the FMLA; breach of contract; and violation of Oklahoma public policy. American Airlines, Inc. (AA) argues that there are no genuine issues of material fact, and that it is entitled to summary judgment on each of McCully's claims.

## I.

The following facts are undisputed. McCully was an AA employee until December 3, 2008. After several years in another department, she began working in AA's payroll group in 1997 or 1998. Dkt. # 17-2, at 5. McCully was diagnosed with Non-Hodgkin's Lymphoma on October 26, 2005. Dkt. # 31-3, at 5. Another employee, Stacy Bland, informed McCully's co-workers. Id. at 5-6. McCully took full-time, or "block," FMLA leave from December 12, 2005 to March 5, 2006.

Dkt. # 31-3, at 29; 31-4, at 1. She then took unpaid sick leave and returned to work on July 3, 2006. Dkt. # 31-3, at 3. McCully then took intermittent FMLA leave from June 1, 2007 to May 31, 2008. Dkt. # 31-4, at 1. During this period she worked four days per week. AA never rejected any of McCully's requests for FMLA leave, nor did her supervisor, Robert Seaman, ever prevent her from taking time off relating to her illness. Dkt. # 31-3, at 29.

On October 13, 2008, McCully discovered that there were entries regarding her unscheduled absences in the C23 screen of the AutoTA, AA's computerized time and attendance system. Dkt. # 31-3, at 20. She looked at her own C23 entries, and those of other employees. Id. The C23 screen is a space for supervisors to record information about employee absences. McCully felt that the entries were misleading or erroneous because, while the entries were true, she thought C23 entries were for a supervisor's record of discussion, and no one had discussed the entries with her. Id. at 24. McCully asked Sue Ruhl, a Federal Tax Analyst in the payroll group and a "lead"[1] for the group, about the entries. Ruhl told McCully to talk to Seaman. Two days later, McCully met with Seaman. Id. at 31-33. Seaman was more concerned with how McCully accessed the C23 than why she was upset about the entries, because he thought that looking at other employees' records was a breach of confidentiality. Id. at 24. McCully refused to answer Seaman's questions regarding how she accessed the C23. Id. at 39.

AA began an investigation into McCully's viewing the C23s. McCully lodged a discrimination complaint with AA's employee hotline, arguing that she had been discriminated against when she returned from her first FMLA leave and through the C23 entries. She also

---

[1]     A "lead" is the first point of contact within a group, and does not have the ability to make hiring and firing decisions. Dkt. # 17-2, at 61.

requested that AA look into possible irregularities involving a promotion Sue Ruhl had previously received. Dkt. # 17-3, at 45. AA investigated McCully's complaint separately from the investigation into her viewing the C23s. However, Jeannie Forbes in human resources conducted both investigations. Dkt. # 31-3, at 40.

McCully's employment was terminated on December 3, 2008. Dkt. # 31-18. She appealed her termination to Brian McMenamy, the vice president and controller of AA, and Seaman's direct supervisor. Dkt. # 17-3, at 53. On January 7, 2009, McMenamy sent McCully a letter upholding Seaman's decision to terminate her. Id. at 61. McCully filed her Complaint in this Court on May 22, 2009. Dkt. # 2.

1.    McCully's First Leave

Prior to her block FMLA leave, McCully was the 401(k) Payroll Tax Analyst. This was a Level 3 analyst position at AA. Dkt. # 17-2, at 95. Her duties included handling reconciliation and remittance issues. There was also a support staff-level employee, Kathy Knight, who handled day-to-day issues regarding 401(k)s, such as phone calls from employees. Dkt. # 17-2, at 8. McCully was Knight's lead. Knight handled most of the 401(k) function while McCully was on block leave.[2] Id. at 9.

When McCully returned to work in July 2006, she was assigned the position of Stock Options Tax Analyst. McCully's compensation, benefits, and seniority did not change. In fact, she received a raise when she returned to work. Dkt. # 17-2, at 95-96. Seaman thought it did not make sense to have McCully resume her 401(k) duties because a support staff person had handled them

---

[2]    When issues requiring an analyst arose, Knight went to an analyst within the payroll group, often Ruhl.

while she was out.  Id. at 9.  He put McCully in the stock options position because it had the same reconciliation and remittance issues as McCully had handled in the 401(k) position.  Id. at 10.  Ruhl had handled the stock options desk before McCully's return.  Id. at 42.

McCully felt the stock options job was a demotion because she "wasn't necessarily being given analyst-type duties," and she was no longer a lead.  Id. at 100.  Initially, the stock options duties took a fair amount of time.  However, within a few weeks, they began to take only about five minutes per day because few employees were exercising stock options.  Dkt. # 31-3, at 9.  When the stock option responsibilities lessened, McCully was designated as the backup for Canadian payroll, worked on pilot salary continuance issues, and a census report.  Id. at 46.  She was also assigned to write desk manuals.  Id. at 8.

McCully states that she attempted to talk to Seaman about her dissatisfaction with the new position, but he was reluctant to discuss it.  Id.  At the time, she did not complain to  human resources or to Seaman's superiors.  Id. at 19.  Another analyst-level employee was brought in to the payroll group to handle stock options after McCully was terminated.   Dkt. # 17-2, at 46.

2.    Reaction to McCully's Illness

In her deposition, McCully testified that Knight was unsympathetic when McCully was first diagnosed with cancer.  She stated that, on October 15, 2005, Knight said "you had better not plan on using any more sick time or being gone because that's not going to work; I have vacation scheduled and I plan on using it, and she does not want to cover my desk."  Dkt. # 31-3, at 5.  McCully testified that Knight acted "very put out, almost as if [she] was lying."  Id. at 6.  After McCully returned, she felt that Knight would not communicate with her at all, and did not want to work with her again.  Dkt. # 31-3, at 4.  Knight provided a written statement to Forbes explaining

that Knight had become very frustrated with McCully's attendance because she had to manage McCully's desk when she was out. Dkt. # 31-27. Knight stated that she "[p]lanned on finding another job when [McCully] returned [from block leave] because [she] didn't want to work with her again." Id.

McCully also testified that Ruhl made fun of McCully's inability to remember things quickly after she returned from block leave. She said that Ruhl "would jab you about it" if you couldn't remember something quickly. Dkt. # 31-3, at 17. McCully remembers the feeling of being talked down to. Dkt. # 31-3, at 17. She also testified that she thought Ruhl was trying to be funny. Id. at 19.

McCully stated that, during her 2007 performance review for the year 2006, she asked Seaman if there were going to be raises that year. He responded, "well, if we do, don't you think it should go to the people that have actually been here, contributed and made a contribution to the company." Dkt. # 31-3, at 53.

At some point, McCully asked Seaman if he had any knowledge of Knight's reaction to her, and he said no. Id. at 11. Seaman stated that he did not notice any change in attitude toward McCully after she returned from her block FMLA. Dkt. # 31-7, at 18. McCully had the general feeling that her co-workers, particularly Knight, Ruhl, and Seaman, thought she was going to have a relapse or die.

3.     Recording of Unscheduled Absences

Employees in Seaman's group worked on a "flex time" policy. Normal working hours at AA were from 8:30 a.m. to 4:30 p.m. However, employees in Seaman's group were allowed to work

different hours, based on their jobs. Dkt. # 31-7, at 7. The "fundamental principle" of flex time was that employees needed to be there to make sure their jobs were done. Dkt. # 31-7, at 8.

In July 2008, Seaman had a conversation with Ruhl about attendance issues. Ruhl told Seaman that she was concerned about McCully's and another employee's attendance.[3] Dkt. # 31-7, at 14. Seaman stated that he began to be concerned about McCully's attendance because "there were times when she didn't come to work, and others had to compensate." Dkt. # 31-7, at 8. He was concerned about Kelly's attendance because she was taking unscheduled absences. Id. at 9. On July 28, 2008, Seaman began keeping a list of unscheduled absences. Id. He stated that he did not speak to McCully about her attendance because it wasn't a problem at that point in time - he was keeping a list because he was concerned that it was going to become a problem in the future. Id. Ruhl stated that unscheduled vacations create a burden on the payroll tax group because the group is one person per function and unscheduled absences mean the group may not be staffed to cover all functions. Dkt. # 31-10, at 10.

At Seaman's direction, Ruhl kept track of flex time usage and unscheduled time off for the eight employees in the payroll tax group. Dkt. # 31-10, at 3. She did not keep track of scheduled time off. Dkt. # 31-10, at 4. Linda Sellers, Seaman's administrative assistant, made entries in the C23 screen based on Ruhl's spreadsheet. Dkt. ## 31-6, at 12; 17-2, at 29. After seven months, Ruhl stopped keeping the spreadsheet, and C23 entries were no longer made.[4] Dkt. # 31-10, at 5. After that, instances of unscheduled absences were sent to Seaman in an e-mail. Dkt. # 31-10, at 5. Ruhl

---

[3]     At some point, Ruhl also had attendance problems. She was leaving work early or taking long lunches. Seaman discussed the issue with her and it stopped. Dkt. # 31-7, at 15.

[4]     Seaman  stopped using the C23 around the same time that McCully was terminated.

stated that she continues to e-mail Seaman with instances of unscheduled absences for employees in the payroll group.  Dkt. # 31-10, at 8.

Seaman explained that he asked Sellers to make entries in the C23 rather than in the Auto TA "Daily Attendance Record" screen because the C23 had a place for comments.  Dkt. # 31-7, at 43. The instructions for the C23 screen state: "type a detailed message of the discussion that you have with the employee.  Include the reason that the employee gives for this occurrence and the complete details of your response."  Dkt. # 31-12, at 1.

4.      McCully Discovers the C23 Entries

McCully had access to AutoTA because she was the backup for another employee on union billing issues.  Dkt. # 31-3, at 21.  McCully used AutoTA about once a month.  Id. at 21.  The union billing work did not require McCully to look at the C23 screen.  Id.  It did not involve McCully accessing her own or anyone in the payroll group's AutoTA information.  Id. at 22.

On October 13, 2008, McCully used AutoTA to check her vacation balance.[5]  Dkt. # 31-3, at 22.  Vacation balance is shown in the C21 "Attendance Control Record" screen, which is separate from the C23 screen.  Dkt. # 42-3, at 1.  While using AutoTA to check her vacation balance in the C21, McCully saw that there was also a C23 for her, so she looked at it.  Dkt. # 31-3, at 22.  McCully then looked at four other payroll group employees' C23 screens and did not see comments.  Id. at 27.  However, other employees' C23s did contain comments.

McCully's C23 entries included the following comments:

•       "Called in 10[/]06[/]08 that she would be late  . . . Tanya Nicolae;"
•       "Megan was not feeling well and will use a VC day today [entry date 9/17/08];"

[5]      McCully could have gone to Jetnet, the AA intranet, to verify her vacation balance.  Dkt. # 17-2, at 85.

- "On 8/15 Megan came in at 10:15 and left work at 2:00;"
- "7/18: Megan is not feeling well - won'b [sic] be in again today;"
- "7/19: Megan called - is not feeling well,  will use remaining 3 hours VC.  Came in at noon;"
- "6/19: Went to DR with husband at 9:45.  Came to work at 12:45;"
- "6/24: Megan called at 9:00 - was stopping at credit union and would be in in about 30 minutes;"
- "6/26: Missed mandatory mtg. with director at 9:00 since she did not arrive until 9:30;"
- "7/17: Megan called - not feeling well - won't be in;"
- "6/4-6/5: Called in said she was not feeling well & took unscheduled VC days;"
- "6/12: Megan called at 9:00 to say she would be 30 to 40 minutes late - no explanation given;"
- "6/18: Megan called at 9:00 to say she would be late.  Husband's BP up and she was making DR's appt."

Dkt. # 31-8.  One other employee's C23 entries included the following comments:

- "7/15: [employee] left voice message at 8:45 - had 11:00 Dr appt didn't think it made sense to come to work to leave to go to the dr.  said she would be in after her appointment;"
- "7/2:  [employee] called at 9:09 left voice msg.  Allergies acting up, taking meds, hadn't left yet;"
- "7/8: [employee] left early - building too hot.  Air was off in building;"
- "7/9: [employee] called at 9:05 - was on the way.  At 11:00 she called to say she was not coming in;"
- "6/3: Called in indicating she was not feeling well and would not be in;"
- "6/11:  called to say she would be in after dr appt at 10:30 took a tylenol pm and did not wake up;"
- "6/17: rescheduled VC day from next week to today for repairs;"
- "6/20: called at 840 to say would be in soon left at 1452 with headache;"
- "7/15: left voice msg at 845 said she had 1100 dr apt and it didn't make sense to come in came in at 1330;"
- "7/21:  had car trouble and rode to work with EE who has flex hours of 600 to 1400."

Dkt # 17-3, at 65.  Another employee's C23 entries included the following comments:

- "6/2:  Not feeling - Went to Dr. told to stay home another day;"
- "6/5: [employee] called - still not feeling well - taking another sk day;"
- "6/13:  [employee] came in at 7:00.  Left before noon to take [name] for a shot."

Id. at 63-64.  A fourth employee's C23 entries included the following comments:

- [entry made 8/2/08] "[employee] took an unscheduled VC day today;"
- [7/28/08] "[employee] called to say she was running late. Came in at 10:00."

Id. at 69.

McCully asked Ruhl about the C23 entries. Ruhl told her to speak to Seaman. Two days later, McCully met with Seaman. He asked McCully how she knew about the C23 entries. According to Seaman, McCully replied "well, if I was in a court of law, I guess I'd have to take the Fifth because I'm afraid of losing my job at this moment and I don't trust you." Dkt. # 31-3, at 35. He issued her a directive to answer the question, and warned her she would be suspended if she refused to answer. Dkt. # 31-3, at 34; 31-7, at 47. McCully continued to refuse to answer the question. Dkt. # 31-3, at 39. McCully felt she was not given a chance to discuss what she wanted to talk about at the meeting, which was the discriminatory nature of C23 entries and not getting her job back after her block FMLA leave. Id. at 35. Seaman felt that the violation of confidentiality needed to be dealt with before McCully's concerns about her C23 entries. Dkt. # 31-7, at 36. At the end of this meeting, McCully was informed that she was going to be withheld from service with pay pending the results of a company investigation.[6] Id. at 39. Seaman felt that accessing other employees' C23s was a breach of confidentiality, and that McCully was being insubordinate by

---

[6] On October 15, 2008 McCully was withheld from service, with pay. Dkt. # 31-21. On October 21, 2008 McCully withheld from service, without pay, due to refusal to cooperate with a company investiation. Dkt. # 31-22. On October 22, her status was changed to withheld from service with pay. Forbes stated that she made this change because she thought the investigation was going to take some time and she didn't feel it was fair to McCully to keep without pay for that period. Dkt. # 17-3, at 26.

refusing to answer his questions. He was also concerned that McCully had looked at Ruhl's pay change.[7] Dkt. # 31-7, at 30.

On October 17, 2008, McCully made a complaint to AA's employee hotline. The record of the call states that McCully was complaining about the duties change after her FMLA leave and the C23 comments. Dkt. # 17-3, at 45. She also requested that management look into Ruhl's promotion, which she and other tax department employees felt was undeserved. Dkt. # 17-3, at 45.

5.      AA's Investigations and McCully's Termination

Jeannie Forbes in human resources handled the investigations of McCully's accessing the C23 and her discrimination complaint. On October 21, 2008, McCully met with Forbes. Dkt. # 31-3, at 40. Forbes asked McCully how she had accessed the AutoTA C23 entries. McCully refused to answer. Dkt. # 31-3, at 41; 31-13, at 4. At some point during this meeting, Forbes tabled that discussion and started a new one regarding McCully's discrimination allegations, including the C23 entries themselves and events surrounding McCully's return from FMLA leave. Dkt. # 31-7, at 49; 31-13, at 7. McCully voiced her complaints to Forbes, particularly her feeling that, through the C23s, she was being set up for a potential layoff in the future. Dkt. # 31-3, at 42-43. McCully also complained that Ruhl had been given a promotion and some of her responsibilities while she was on FMLA leave. Id. at 8. Forbes asked McCully to provide a written statement of her discrimination allegations, and McCully did so. Dkt. # 17-2, at 114-15.

Forbes stated that McCully's failure to be forthright about how she accessed the C23s "didn't help her at all in us trying to conduct an investigation for all of her claims." Dkt. # 31-3, at 19.

---

[7]      At some point, McCully had asked Ruhl about a raise that she received. Dkt. # 17-2, at 135. McCully found out about this raise by looking at Ruhl's paycheck during an audit, and noticing a spike in her pay. Dkt. # 17-2, at 133-34. The record is not clear as to when this occurred.

Forbes looked at McCully's C23 and compared it with others within the department. Dkt. # 31-13, at 20. Forbes stated that McCully "wasn't the only one that had some comments in her C23, and the comments were pretty generic." Id. at 21. She concluded that McCully "was being treated the same as every one else." Id. at 23. She determined that McCully was not being penalized for taking FMLA leave, and that the C23 comments were related to vacation or other reasons for not coming to work - not to her disability or her FMLA leave. Id. at 24. Forbes also investigated McCully's claim that she lost job responsibilities. Forbes concluded that "she had come back and been given like work, didn't get a demotion, didn't lose any pay. That fulfilled American Airlines' responsibility." Id. at 28. Forbes interviewed Seaman, Ruhl, and Knight as a part of this investigation. Dkt. # 17-3, at 37. On November 20, 2008, Forbes sent McCully a letter informing her that AA found no basis to support her discrimination claim. Id. at 48.

McCully met with Seaman and Forbes on December 3, 2008. Dkt. # 31-3, at 46. She received a final advisory terminating her employment on that date. Dkt. # 31-18. Seaman stated that McCully was terminated for inappropriately accessing the C23s and not cooperating in the investigation. Dkt. # 31-6, at 24. She was not terminated because of attendance issues or for poor job performance. Id.

McCully appealed her termination to McMenamy. Dkt. # 31-3, at 48. In her appeal letter, she stated that she had been harassed and discriminated against on the basis of her FMLA leave. Dkt. 17-3, at 42. McMenamy investigated the termination only - not McCully's discrimination claim. Dkt. # 31-6, at 5. He stated that he was not focused on McCully's discrimination and harassment allegations; he reviewed the reasons Seaman decided to terminate her employment. Dkt. # 31-6, at 28. He also knew that, as part of her job, McCully had access to AutoTA. Id. at 10-11.

McMenamy met with McCully on December 23. Dkt. # 31-6, at 25-26. In preparing for his meeting with McCully, McMenamy spoke with Ruhl. McMenamy's notes from his discussion with Ruhl contain bullet points: "McCully just worked a four-day workweek, she'd not always feel good, take blank days;" and bullet two: "we started documenting in C23 for her and others, as we may need documentation to do layoffs." Dkt. # 31-6, at 19-20.

At the meeting, McMenamy told McCully that she should tell him why her termination was unjust, and she told him about her cancer and that she wasn't given her old job back when she returned from leave. Dkt. # 17-2, at 125-26. McMenamy upheld Seaman's decision to terminate McCully. Dkt. # 31-19. He sent her a letter that stated, "[d]uring your appeal you addressed your return from FMLA and the business functions that you were asked to perform. You also discussed the actions taken by management since your return from leave." Dkt. # 17-3, at 61. McMenamy concluded that McCully's "performance does not meet the expectations and standards of American Airlines management. The information you provided during your appeal is not sufficient to overturn the action taken by your manager." Id.

6.    Code of Conduct and Policies

The AA Employee Policies Guide states, "please be aware that employment with AA is considered 'at will,' meaning that either you or the company may terminate the relationship at any time, for any reason." Id. at 72. The AA Rules of Conduct are part of the Employee Policy Guide. Dkt. # 17, at 4. The Rules of Conduct states, "the rules listed below represent the guidelines and principles that all employees work by at [AA]." Dkt. # 17-3, at 74. There is also an AA Code of Conduct. The first paragraph of the document states that "the Code of Conduct, which includes the company's rules and policies about conflict of interest or violation of trust, and the Rules of Conduct

contain good guidelines for professional and ethical conduct." Dkt. # 31-25, at 1. The Code instructs employees to contact the Business Ethics office or the Network ReportLine if they suspect a violation of the company's Code of Conduct. Id. at 2. The Rules and Regulations document provided to employees when they join the company informs employees that they have a responsibility to promptly report suspected unethical activity. Dkt. # 31-26, at 1.

Finally, AA has instructions regarding use of AutoTA, and specifically the C23 screen. The C23 instructions for the comments field state: "[t]ype a detailed message of the discussion that you have with the employee. Include the reason the employee gives for this occurrence and the complete details of your response. Close the comment record by including your name or initials and your title . . ." Dkt. # 31-12, at 1. The instructions also state that the description field should contain "a detailed message of the discussion you had with the employee regarding the Lost Time Occurrence." Dkt. # 31-14, at 5.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

### III.

AA argues that it is entitled to summary judgment on each of McCully's claims. Each claim (and sub-claim) is analyzed separately.

A.    ADA and OADA Discrimination

McCully alleges that AA's actions constitute discrimination based upon a disability and/or being perceived as disabled,[8] in violation of the ADA and OADA. Dkt. # 2, at 6. AA argues that it is entitled to summary judgment on these claims. It argues that McCully cannot establish a causal connection between her disability and its actions, and that it took them for legitimate, nondiscriminatory reasons.

1.    ADA Discrimination

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). ADA discrimination cases are governed by the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). Pursuant to this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If she does so, "then the defendant must offer a legitimate, non-[discriminatory] reason for the employment action. The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006) (citations omitted). In order to defeat a motion for summary judgment, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual-i.e., unworthy of belief." Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).

---

[8]    There is no need to determine whether McCully is perceived as disabled, as the Court assumes that she is disabled under the ADA and OADA, and that other employees were aware of this disability.

Pretext can be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Morgan, 108 F.3d at 1323 (10th Cir. 1997) (quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d. Cir. 1996)). However, "[m]ere conjecture that the employer's reason is pretext . . . will not defeat a motion for summary judgment." Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997).

> In order to establish a prima facie case under the ADA, a plaintiff must demonstrate:
>
> (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, that is, she is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer terminated her employment under circumstances which give rise to an inference that the termination was based on her disability.

Morgan, 108 F.3d at 1324 (internal citations omitted). For the purposes of summary judgment, AA does not dispute that McCully has established the first and second elements of her prima facie case. Dkt. # 17, at 33 n.4. However, AA argues that McCully cannot show that her change in job responsibilities, the C23 entries, or her termination were due to her disability.[9] Further, AA argues that it had legitimate, nondiscriminatory reasons for these actions and that McCully cannot demonstrate pretext.

a.    Change in Duties

McCully alleges that AA discriminated against her by changing her job duties because she has cancer. The Tenth Circuit recognizes "temporal proximity between protected conduct and [the adverse action] as relevant evidence of a causal connection sufficient to 'justify an inference of

_____

[9]    AA also argues that the C23 entries were not an adverse employment action. That argument is considered in Part III.D.2, infra.

retaliatory motive.'" <u>Metzler</u>, 464 F.3d at 1171 (quoting <u>Garrett v. Hewlett-Packard Co.</u>, 305 F.3d 1210, 1221 (10th Cir. 2002)). However, "a plaintiff may rely on temporal proximity alone only if 'the [adverse action] is <u>very closely</u> connected in time to the protected activity.'" <u>Id.</u> (quoting <u>Anderson v. Coors Brewing</u>, 181 F.3d 1171, 1179 (10th Cir. 1999)) (emphasis in original). A time period of four to six weeks between the protected activity and the adverse action has been deemed sufficiently close to establish the third prong of a prima facie case. <u>Id.</u> at 1172. However, a period of three months is, by itself, insufficient to establish causation. <u>Id.</u> (citing <u>Richmond</u>, 120 F.3d at 209).

There is a close temporal connection between McCully's cancer diagnosis and the change in her job duties, given that McCully was at work for only about a month between her diagnosis and the change. Assuming that McCully has established a prima facie case based on the change in her duties,[10] AA has articulated a legitimate, nondiscriminatory reason for changing her duties: the reconciliation issues regarding the 401(k)s were basically resolved, and Seaman needed McCully to perform similar work on stock options.

McCully argues that this explanation is pretextual. McCully's proffered evidence of pretext is her own feeling that Seaman was reluctant to give her any long term tasks. Dkt. # 17-2, at 100 (McCully's testimony that "I just felt like it was because they just felt like I might be the short-timer"). However, McCully testified that no one within the group ever said that he or she thought McCully couldn't perform her job because of her cancer. <u>Id.</u> at 75. Unsupported allegations or feelings alone do not establish genuine issues of material fact. <u>See</u> <u>Cone v. Longmont United Hospital Ass'n</u>, 14 F.3d 526, 531 (10th Cir. 1994) ("allegations alone will not defeat summary

---

[10]  And assuming that the change in her duties was an adverse employment action.

judgment"). The fact that the stock options job ended up not taking much time is not evidence of pretext; the job took less time because the stock market declined. Dkt. # 31-3, at 9. McCully has provided no evidence that Seaman anticipated this change in the market when he decided to change her responsibilities. McCully has identified no inconsistencies or implausibilities in Seaman's justification for the change in her duties from which pretext could be inferred.

McCully also argues that "comments by co-workers regarding her allowed time off [and] comments by co-workers when she returned about her chemo[therapy]-related memory lapses . . . indicated discrimination based on her disability." Dkt. # 31, at 37. McCully perceived that Knight did not want to work with her and stated that Ruhl made fun of her slower memory. Dkt. # 31-3, at 4, 19. This is not evidence that Seaman's reasons for changing her duties were pretextual. McCully has provided no evidence that Knight or Ruhl's feelings about McCully's disability had any part in Seaman's decision. Cf. Cone, 14 F.3d at 531(determining that age-related comments by non-decisionmakers were not material in showing that employer's action was based on age discrimination). In fact, the undisputed facts show that Seaman was unaware of a change in attitude toward McCully after her return to work. Dkt. # 31-7, at 18. McCully has provided no evidence from which a jury could infer that AA's reason for changing her job duties is pretextual.

b.     C23 Entries

To establish the third element of her prima facie case, McCully must present "some affirmative evidence that disability was a determining factor in the employer's decision." Morgan, 108 F.3d at 1323.  While "not onerous," this requirement is "not empty or perfunctory."  Id.  The time period between McCully's diagnosis or the manifestation of her symptoms and the recording of unscheduled absences in AutoTA does not support an inference of discrimination.  McCully was diagnosed with cancer in October 2005.  Dkt. # 31-3, at 5-6.  Absences were recorded in AutoTA beginning in July 2008.  Dkt. # 31-7, at 11-12.  The nearly three year period between McCully's diagnosis and the C23 entries does not support a causal connection between the two.  See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding that a seven month period, standing alone, was not sufficient to establish causation).

McCully argues that McMenamy's notes of his conversation with Ruhl (in connection with McMenamy's review of McCully's appeal) establish a causal connection between her disability and the recording of her absences in AutoTA.  McMenamy's notes of his conversation with Ruhl contained two consecutive bullet points: first, that McCully would not always feel good and would take days off; and second, that the payroll group started documenting McCully's and others' absences.  Dkt. # 31-6, at 19-20.  This does not establish a causal connection between McCully's cancer and the C23 entries; at most it would support a causal connection between McCully's unscheduled absences[11] and the C23 entries.

---

[11]     Some of McCully's unscheduled absences were for reasons unrelated to her illness.  For instance, she had two unscheduled absences for her husband's doctor's appointments.  Dkt. # 31-8.

However, even assuming that McCully had established the third element of her prima facie case, AA has articulated a non-discriminatory reason for making the C23 entries: Seaman's concern that employees were abusing the flex time policy. McCully has the burden to show a genuine issue of material fact regarding the veracity of this explanation.

McCully has provided no evidence from which a jury could infer that Seaman's explanation is pretextual. Ruhl stated that unscheduled absences burden the payroll group. Dkt. # 31-10, at 10. McCully has provided no evidence that this explanation is implausible or unworthy of credence. McCully insists that the C23 screen was not the proper place to record information about unscheduled absences if they were not first discussed with the employee. The Court fails to see how this, even if true, would support an inference of pretext. This is not the sort of procedural irregularity that renders an employer's explanation suspicious. Cf., e.g., Trujillo v. PacifiCorp, 524 F.3d 1149, 1159 (10th Cir. 2008) (finding employer's claim that time and gate records should exactly reflect an employee's self-recorded hours possibly pretextual, in light of testimony that time sheet and gate access procedures were rarely followed). Further, the relevant question is not whether the C23s were the proper place to record absence information; the question is whether Seaman's explanation for why absences were recorded in the C23s is the real explanation. See Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001) ("[w]e may not second guess the business judgment of the employer . . . . [t]he relevant question is whether the reason articulated by the employer was the real reason for the challenged action").[12] McCully has provided no evidence that Seaman's stated reason making the C23 entries was not the real reason, regardless of whether it was a good reason.

---

[12]     Thus, the Court finds that any issue as to how the C23 should or should not be used, and whether or not C23 entries are permanent, is immaterial.

McCully also suggests that pretext could be inferred from Seaman's statement that McCully did not have an attendance problem, but that she might have one in the future.  Dkt. # 31, at 8, 14.  The Court fails to see how this statement is evidence of pretext.  An employer certainly may record unscheduled absences for an employee, whether or not she has an attendance problem. Further, how would a supervisor know if an employee had an attendance problem unless he recorded information about her absences?  The Court will not second-guess Seaman's managerial decision to keep track of unscheduled absences, nor will it be side-tracked by an irrelevant inquiry into what the best method by which to record unscheduled absences might have been.

Further, the fact that Seaman might have had concerns about McCully's attendance in particular does not raise an inference of pretext.  McCully does not dispute the accuracy of the C23 entries, or the fact that she had several unscheduled absences.  Her entries were no different than those of several other employees.  Cf. Morgan, 108 F.3d at 1324 ("[a] satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to violation of a work rule could have lent support to the pretext argument").  Three other employees in the group had comments in their C23 screens, and these comments are substantially similar to those in McCully's.  Dkt. ## 31-8, 17-3.  McCully has failed to provide any evidence that she was subjected to differential treatment.  She has failed to provide any evidence from which pretext could be inferred.

c.    <u>Termination</u>

McCully argues that AA is self-insured[13] and that "the trier of fact may infer that a self-insured employer has terminated an 'expensive' employee to save itself money."  Dkt. # 31, at 37.  McCully cites <u>Trujillo v. PacifiCorp</u>, 524 F.3d 1149 (10th Cir. 2008), for the proposition that "[s]uch evidence weighs heavily in favor of demonstrating motive to discriminate against an employee with a serious illness."  Dkt. # 31, at 37.  However, <u>Trujillo</u> does not support the assertion that pretext may be inferred solely from the fact that an employer is self-insured.  In that case, the Trujillos' son had a terminal illness that required expensive treatment.  They were both fired shortly after their son had a relapse.  In addition to evidence of the employer's general concerns about rising healthcare costs, the Trujillos provided specific evidence that their employer considered their son's medical claims high dollar, that there was only one other terminal illness claim during the relevant time period, and that the employer was specifically tracking those claims.  524 F.3d at 1156.  The Tenth Circuit found that the Trujillos' evidence that PacifiCorp was monitoring their claims in particular was evidence from which a jury could infer that the employer's explanation for their termination was pretextual.[14]  McCully has presented no such evidence in this case.  The record is entirely devoid of any evidence that AA was tracking the cost of McCully's health care claims, that McCully's claims were unusual or particularly expensive,  or even that AA was generally concerned about its

---

[13]    McCully's only evidence that AA is self insured is her own affidavit. Dkt. # 31-5, at 4.  The Court assumes, for the purposes of the motion for summary judgment, that AA is, in fact, self-insured.

[14]    The Tenth Circuit also stated that "[t]he Trujillos' strongest evidence of discriminatory motive is found in the temporal proximity between the time of [their son's] relapse and the investigation of the alleged time theft and their termination."  <u>Trujillo</u>, 524 F.3d at 1157.

health care costs.  In this case, the mere fact that AA is self-insured cannot give rise to the inference that actions were taken against McCully because she has cancer.

The temporal connection between McCully's termination and her diagnosis is highly attenuated.  She was terminated three years after she was diagnosed with cancer.  McCully has provided no evidence that connects her termination with her cancer.  In fact, McCully has provided no evidence that connects her termination with her absences, whether or not those were due to her cancer.  To the contrary, the undisputed facts show that McCully's absences and work performance were not factors in her termination.  McCully has failed to establish the third element of her prima facie case.

However, even assuming that McCully had established a causal connection between her cancer and her termination, AA has provided a legitimate, nondiscriminatory reason for this action.  AA argues that it terminated McCully because she improperly accessed confidential personnel files, including the files of other employees, and she refused to cooperate in AA's investigation of those actions.

McCully argues that AA's explanation is unworthy of credence because she technically had access to all of AutoTA, and that AA was aware of this when it terminated her.  These facts are of no relevance.[15]  AA did not state that McCully was terminated because of the manner in which she accessed the C23s; she was terminated because she looked at the C23s, including those of other employees, when she had no business doing so.  The undisputed facts show that McCully did not accidentally stumble upon this information; she decided to access a separate screen from the one she

---

[15]     The Court agrees with AA that McCully's accessing the C23s is like "an employee who has the backup key to the HR office deciding to use that key to gain access to the office to review employee personnel files."  Dkt. # 42, at 7.  McCully's AutoTA access was not a carte blanche to use that access for whatever purposes she wanted.

was originally viewing, and then further decided to view that screen for other employees. Dkt. # 42-3, at 1-2.[16]  Seaman found this to be a serious breach of confidentiality and evidence of poor judgment.[17]  Whether or not McCully had to "hack in" to the system is of no consequence. The undisputed facts show that McCully decided to look at other employees' C23s, and Seaman believed this was improper and violated the rules of confidentiality.

There is also no evidence that Seaman's and Forbes' concerns about McCully's refusal to cooperate with the investigation are unworthy of credence. It is undisputed that McCully refused to answer Seaman's questions regarding how she accessed the C23s, and initially refused to answer Forbes' questions. McCully has not shown that it is implausible that an employer would look negatively upon an employee's refusal to answer questions.

McCully also argues that the fact that AA conducted "separate" investigations of her termination and her discrimination complaint is evidence of pretext. The undisputed facts show that McCully's discrimination complaint was investigated; in fact, it was investigated by the same person who investigated her termination - Forbes. McCully had a chance to tell her side of the story to Forbes, and provided a written statement of her discrimination complaint. Dkt. ## 17-2, at 114-15, 31-3, at 42-43. Forbes determined that there was no discrimination in the change in her duties or

---

[16]      To do this, McCully had to enter each employee's identification number. Dkt. # 42-3, at 1-2.

[17]      McCully's suggestion that the Company Information Systems (CIS) policy permitted her to view of her own and other employees' confidential information is preposterous. Her suggestion that accessing other employees' confidential files is the sort of "incidental personal use" permitted by the policy is unfounded. Dkt. # 31, at 20. The full paragraph states that "[w]hile incidental personal use of these systems is allowed, it should be consistent with the Company's **Rules of Conduct**. Any usage that interferes with performing your job . . . or violates the Company's expectations . . . is strictly prohibited." Dkt. # 50-10, at 1. Further, the CIS policy was for company information systems in general (such as computers and telephones), not for AutoTA in particular.

in the use of the C23s. This determination was made before McCully's final termination. Dkt. #

17-3, at 48. There is nothing suspicious about AA's refusal to formally combine the investigations.[18]

McMenamy was aware of McCully's discrimination allegations when he considered her appeal.

Even if McMenamy did not give McCully the opportunity to explain her discrimination allegations,

this would not show pretext. McMenamy conducted his own investigation and decided to affirm

Seaman's decision to terminate McCully. There is no evidence that AA ignored her discrimination

complaint or conducted a perfunctory investigation. There is no evidence that McCully was

terminated for any reasons other than her breach of confidentiality and failure to cooperate with

AA's investigation.

For these reasons, the Court finds that AA is entitled to summary judgment on McCully's

ADA discrimination claim.

2.     OADA

The OADA prohibits employers from discriminating against people on the basis of disability.

OKLA. STAT. tit. 25, § 1302(A)(1); §1901 (providing a private cause of action for disability

discrimination). AA argues that McCully's OADA claim fails for the same reasons as her ADA

claim. Dkt. # 17, at 42. McCully's response to AA's motion for summary judgment mentions the

---

[18]     Forbes' statement that "'normally' discrimination complaints are treated as one investigation
even if they have different subparts," Dkt. # 31, at 37, is not evidence that the proffered
reason for McCully's termination is pretextual. First, Forbes' statement relates to
discrimination complaints only, and does not show that AA normally combines
investigations of discrimination complaints and terminations or improper access to company
records. Second, even if AA were to have such a policy, McCully has failed to show that
there is anything suspicious about the failure to formally combine the investigations in this
case. They were both handled by the same person, and McCully had the opportunity to
explain her discrimination allegations to this person. McCully has failed to explain how the
formal separation of the two investigations operated to her detriment. Merely identifying
procedural irregularities will not defeat a motion for summary judgment; those procedural
irregularities must somehow be probative of pretext.

OADA with reference to her <u>Burk</u> tort claim only; she does not argue that she has an independent OADA claim. Dkt. # 31, at 4. The Tenth Circuit has determined that a plaintiff's OADA claim fails if her federal discrimination claims fail. See <u>Barzellone v. City of Tulsa</u>, No. 99-5088, 2000 WL 339213, at *5 (10th Cir. Mar. 31, 2000) (unpublished);[19] <u>Anthony v. City of Clinton</u>, No. 98-6188, 1999 WL 390927, at *8 n.6 (10th Cir. June 15, 1999) (unpublished); <u>LeFlore v. Flint Indus., Inc.</u>, No. 98-5024, 1999 WL 89281, at *3 n.4 (10th Cir. Feb. 23, 1999) (unpublished) (affirming district court's holding - unchallenged on appeal - that the legal analysis for plaintiff's OADA claim was the same as his ADEA claim); <u>Wilson v. State Ins. Fund ex rel. Okla.</u>, No. 96-6100, 1997 WL 12929, at *2 (10th Cir. Jan. 15, 1997) (unpublished) ("[f]or essentially the same reasons set forth in our analysis of the ADA claim, plaintiff's state statutory claims also fail"); <u>see also Stanley v. White Swan, Inc.</u>, No. CIV-00-1291-F, 2002 WL 32061753, at *11(W.D. Okla. Sep. 26, 2002) ("[b]ecause the protections provided by [the OADA] are co-extensive with the protections provided by federal law under the ADA, plaintiff's claim of handicap discrimination in violation of state law fails for the same reasons her federal claim fails"). McCully's OADA discrimination claim fails for the same reasons her ADA discrimination claim fails.

B.    <u>ADA and OADA Retaliation</u>

McCully alleges that AA's actions constitute retaliation for complaining about the discriminatory treatment she was receiving as a result of her disability and/or perceived disability, in violation of the ADA and OADA. Dkt. # 2, at 6. The ADA prohibits employers from retaliating against employees who have made complaints of disability discrimination. 42 U.S.C. § 12203. "To establish a prima facie case of reprisal, a plaintiff must show (1) protected employee action; (2)

---

[19]    Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1: 10th Cir. R. 32.1.

adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." Morgan, 108 F.3d at 1324. Retaliation claims are also subject to the McDonnell Douglas burden-shifting framework. Id.

Neither the change in her duties nor the C23 entries could possibly constitute retaliation for a complaint about discriminatory treatment because those actions were taken prior to McCully's complaint. It is undisputed that McCully did not complain to management about her treatment until October 13, 2008, at the earliest.[20] Dkt. # 31, at 9-10. Thus, her termination is the only event that could form the basis of a retaliation claim. However, McCully's retaliation claims (under the ADA and OADA) fail for the same reasons her discrimination claim fails: she has provided no evidence from which a jury could infer that AA's stated reasons for terminating her are pretextual. See Part III.A.1.c, supra.

C.     FMLA Interference

McCully alleges that AA's actions constitute interference with her use or attempted use of medical leave, in violation of the FMLA. Dkt. # 2, at 7. She alleges that AA interfered with her FMLA rights by: failing to offer her the same or an equivalent job upon her return from FMLA leave; allowing discriminatory actions to be taken against her; and firing her. Id. AA argues it is entitled to summary judgment on the interference claim because McCully cannot establish a prima facie case or a genuine issue of material fact as to pretext. Dkt. # 17, at 21. Further, AA argues that some of McCully's interference claims are barred by the statute of limitations. Id. at 21-22.

---

[20]     McCully did not make a formal complaint to the AA discrimination hotline until October 17, 2008. Dkt. # 17-3, at 45.

The FMLA gives employees the right to take unpaid medical leave for a period of up to twelve work weeks in any twelve month period for a serious health condition. 29 U.S.C. § 2612(1); Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 959 (10th Cir. 2002). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1). To establish an FMLA interference[21] claim, a plaintiff must show: "(1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with [her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of [her] FMLA rights. Jones v. Denver Public Sch., 427 F.3d 1315, 1319 (10th Cir. 2005). If the plaintiff shows that her FMLA leave was interfered with, the burden shifts to the employer to show that the adverse action would have been taken regardless of the employee's FMLA leave. Diffee Ford, 298 F.3d at 963. The Court will analyze each of the actions McCully identifies as incidents of interference.

1.    Failure to Return to Equivalent Position

McCully alleges that AA interfered with her FMLA rights by failing to return her to an equivalent position after she returned from FMLA leave. Dkt. # 2, at 7. AA argues that this claim is barred by the statute of limitations, and that McCully cannot establish the second or third prongs of a prima facie case. Dkt. # 17, at 22-25.

The FMLA contains two limitations periods: one for "willful" violations, and one for all other violations. 29 U.S.C. § 2617(c). The limitations period for is three years from the "date of the last event constituting the alleged violation" for willful violations, and is two years for other

---

[21]    The Tenth Circuit recognizes two theories of recovery under the FMLA: interference under 29 U.S.C. § 2615(a)(1) and retaliation under 29 U.S.C. § 2615(a)(2). Metzler v. Fed. Home Loan Bank of Topeka 464 F.3d 1164, 1170 (10th Cir. 2006). The two types of claims have different elements and burdens of proof. Id.

violations.  Id.; Bass v. Potter, 522 F.3d 1098, 1100 (10th Cir. 2008).  AA argues that McCully's failure to restore claim is time-barred because she filed suit (and first raised the claim with AA) more than two years after she returned from unpaid sick leave.  McCully argues that the three-year limitations period for willful violations, rather than the two-year period, applies.  Dkt. # 31, at 27.

The FMLA does not define "willful," and the Supreme Court has not spoken to its meaning under § 2617(c)(2).  However, in McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), the Supreme Court construed the term in the context of the Fair Labor Standards Act.  The Tenth Circuit applies the McLaughlin willfulness standard to the FMLA.  Bass, 522 F.3d at 1103-04.  In order for the three-year limitations period to apply, "a plaintiff must demonstrate that his employer 'knew or showed reckless disregard' for whether its conduct was prohibited by the FMLA."  Id. at 1104 (quoting McLaughlin, 486 U.S. at 133).

McCully has provided no evidence that AA willfully violated the FMLA when it placed her in the position of Payroll Tax Analyst for Stock Options when she returned to work in July 2006. In fact, any argument that AA willfully violated the FMLA is undercut by parties' disagreement as to whether the stock options position was equivalent to her prior 401(k) position.  If there is a legitimate dispute as to whether AA actually violated the FMLA at all, it is difficult to see how it knew or should have known that it was committing a violation.  The FMLA required AA to restore McCully to her previous position or "to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment."[22]  29 U.S.C. § 2614(a)(1).  It is undisputed that McCully's compensation, benefits, seniority, and physical office remained the same when she

---

[22]    AA argues that it was not required to restore McCully because she did not return to work upon exhausting her block leave.  The Court assumes, for the sake of argument, that AA was required to reinstate McCully.

returned to work in July 2006. Dkt. # 17-2, at 96. Further, McCully was replaced by another analyst, rather than a support staff employee, after she was terminated. Dkt. # 17-2, at 46. McCully argues that the stock options position was not equivalent because she was not a lead, and it was "menial." Id. at 96-100. The Court need not determine whether these differences render the two positions non-equivalent as a matter of law. It is sufficient that AA reasonably believed that they were equivalent and, thus, did not willfully violate the FMLA.

Further, it is undisputed that AA granted McCully's subsequent FMLA requests and Seaman never refused to let McCully take time off related to her cancer. Dkt. # 17-2, at 93-94. It defies logic to think that AA would willfully interfere with McCully's FMLA rights but continue to permit her to take FMLA leave and non-FMLA time off for her cancer. For these reasons, the Court finds that any alleged violation of the FMLA that occurred in July 2006 was not willful. Therefore, the two-year statute of limitations applies and the claim is untimely.

2.    Allowing Discriminatory Actions Against Her

Although the complaint does not specifically list the discriminatory actions that constituted interference, Dkt. # 2, at 7, the Court assumes that McCully intends to state a claim for the C23 entries. AA argues that it did not interfere with any of McCully's FMLA rights, Dkt. # 17, at 21, and, further, that recording unscheduled absences in the C23 was not discriminatory, id. at 28.

The second element of an interference claim is that an adverse action interfered with the plaintiff's rights under the FMLA. Jones, 427 F.3d at 1319; see also Dry v. The Boeing Co., 92 Fed. App'x 675, 678 (10th Cir. 2004) (unpublished)[23] ("a prima facie case under an interference/entitlement theory requires a showing of . . . a denial of substantive rights under the

---

[23]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

FMLA").  Interference could be refusing requested FMLA leave, otherwise preventing an employee from using FMLA leave, or discouraging the employee from applying for or using leave.  29 C.F.R. § 825.220(b); Mardis v. Cent. Nat'l Bank & Trust of Enid, No. 98-6056, 1999 WL 218093, at *2 (10th Cir. April 15, 1999) (unpublished).  Therefore, "[i]n order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' [sic] of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave."  Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007).  In this case, McCully has failed to provide any evidence that the C23 entries interfered with her FMLA rights.

It is undisputed that McCully was granted all the FMLA leave and non-FMLA illness-related time off that she requested.  Dkt. # 17-2, at 93-94.  At the time that AA began recording her absences in the C23, McCully had finished a year of intermittent FMLA leave from June 1, 2007 to May 31, 2008.  Id. at 93; Dkt. # 17-3, at 36.  McCully has provided no evidence that she desired or was entitled to FMLA leave after May 31, 2008.  She has not alleged that the recording of her absences prevented or discouraged her from requesting or using any FMLA leave.[24]  She has failed to satisfy the second element of a FMLA interference claim because she cannot show that the recording of her absences interfered with an FMLA right.  See McBride v. CITGO Petroleum Gp., 281 F.3d 1099, 1108 (10th Cir. 2002) ("the FMLA only protects an employee's right to request and take leave while ill").

---

[24]     In fact, McCully alleges that she was never informed that her absences were being tracked. Dkt. # 31, at 8.  It is difficult to see how activity of which she was unaware could have discouraged her from exercising her FMLA rights.

3.    Termination

McCully alleges that her termination interfered with her FMLA rights.  However, this claim

fails for the same reason as her interference claim relating to the C23 entries.  See Part III.C.2, supra.

McCully was not on FMLA leave when she was terminated, nor has she alleged that she requested

or was entitled to FMLA leave at that time.   Therefore, she cannot show that her termination

interfered with an FMLA right.  Cf. Nealey v. Water Dist. No. 1, 324 Fed. App'x 744, 750 (10th Cir.

2009) (unpublished)[25] (determining that plaintiff satisfied the second element of her interference

claim where she was discharged before she could take all of her accrued leave).

For these reasons, AA is entitled to summary judgment on McCully's FMLA interference

claim.

D.    FMLA Retaliation

McCully alleges that AA retaliated against her use of FMLA leave and complaint of FMLA

discrimination by:  failing to offer her the same or an equivalent job upon her return from FMLA

leave; allowing discriminatory actions to be taken against her; and firing her.  Dkt. # 2, at 8.

The FMLA prohibits an employer from discriminating against an employee for opposing

a practice made unlawful by the FMLA.  29 U.S.C. § 2615(a)(2).  Like ADA claims, FMLA

retaliation claims are subject to the McDonnell Douglas burden-shifting framework.  Campbell, 478

F.3d at 1287.   To make out a prima facie FMLA retaliation claim, a plaintiff must show that "(1)

she engaged in a protected activity; (2) [her employer] took an action that a reasonable employee

would have found materially adverse; and (3) there exists a causal connection between the protected

activity and the adverse action."  Metzler, 464 F.3d at 1171.  The Tenth Circuit characterizes "the

_____

[25]       Unpublished decisions are not precedential, but may be cited for their persuasive value.  See
          Fed. R. App. 32.1: 10th Cir. R. 32.1.

showing required to satisfy the third prong under a retaliation theory to be a showing of bad intent or 'retaliatory motive' on the part of the employer." <u>Campbell</u>, 478 F.3d at 1287 (quoting <u>Metzler</u>, 464 F.3d at 1171).

1.      <u>Failure to Return to Equivalent Position</u>

AA argues that McCully's retaliation claim based on the failure to restore her to her previous position is time barred.  <u>See</u> Part III.C.1, <u>supra</u>.  However, unlike interference claim, the Court finds it more appropriate to treat the failure to return claim as part of an alleged ongoing pattern of retaliation.[26]  Because the last act constituting the alleged retaliation (McCully's termination) occurred within the two-year limitations period, the Court finds that McCully's retaliation claim based on the failure to return her to an equivalent position is not time-barred.[27]

AA also argues that McCully cannot establish the third element of her prima facie case for retaliation based on the failure to restore her to her old position.[28]  McCully's first block FMLA leave ended on March 5, 2006.  She was then on sick leave and returned to work on July 3, 2006.  Thus, there was a period of roughly four months between the protected activity and the allegedly adverse employment action.  While this period alone might not be sufficient to establish the third prong of McCully's prima facie case, <u>see</u> <u>Metzler</u>, 464 F.3d at 1171 (noting that a period of three

---

[26]     While an employer could engage in a pattern of retaliation against an employee for complaining about FMLA violations, an employer can interfere with specific FMLA leave only.

[27]     Further, it is unclear whether the two or three year limitation period would apply to a retaliation claim.  Retaliation, unlike interference, is necessarily intentional.  Because the Court finds that this claim is not time-barred under either limitations period, it need not determine whether intentional retaliation is necessarily a willful violation of the FMLA and, therefore, subject to the three-year limitations period.

[28]     The Court assumes, for the sake of argument, that the change in position was an action that a reasonable employee would have found materially adverse.

months between the protected activity and the adverse action is, by itself, insufficient to establish causation), she has offered some additional evidence of a causal connection, namely Seaman's statement that "don't you think [raises] should go to the people that have actually been here, contributed and made a contribution to the company," Dkt. # 31-3, at 53. Viewed in the light most favorable to McCully, the Court finds that this evidence could give rise to an inference of retaliatory intent by AA. Therefore, McCully has made her prima facie case.

AA has provided significant evidence of a legitimate, nondiscriminatory reason for the change in McCully's responsibilities. See Part III.A.1.a, supra. McCully has offered no evidence that AA's reasons for changing her job responsibilities in July 2006 were pretextual. See id. Therefore, AA is entitled to summary judgment on McCully's claim that AA retaliated against her by changing her job responsibilities in July 2006.

2.    Allowing Discriminatory Actions Against Her

AA argues that McCully's claim regarding the recording of unscheduled absences fails because: it is not an adverse employment action; McCully cannot establish a causal connection between the recording of unscheduled absences in the C23s and her FMLA leave; and it had a legitimate, non-discriminatory reason for doing so.

The second element of a prima facie case of FMLA retaliation is "an action that a reasonable employee would have found materially adverse." Metzler, 464 F.3d at 1171. Despite the fact that the Tenth Circuit liberally interprets the term, not all workplace incidents are "adverse employment actions." Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998). "An adverse employment action constitutes a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing

a significant change in benefits.'"  Annet v. Univ. of Kansas, 371 F.3d 1233, 1237 (10th Cir. 2004)

(Title VII case) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  Whether an

action is adverse depends on the facts of each case.  Burlington N. And Santa Fe Ry. Co. v. White,

548 U.S. 33, 69 (2006).

       An action is adverse when it causes a plaintiff to actually lose salary or benefits.  E.g.,

Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1316 (10th Cir. 2006).  However, the

following actions or incidents have been found to be not adverse:  a lateral transfer without a

significant change to working conditions; Lara v. Unified Sch. Dist. #501, No. 08-3320, 2009 WL

3382612, at *3 (10th Cir. Oct. 22, 2009) (unpublished)[29]; snubbing or silent treatment by co-

workers, Steele, 264 Fed. App'x at 746; MacKenzie v. City and County of Denver, 414 F.3d 1266,

1279 (10th Cir. 2005); verbal warnings without further discipline, Steele, 264 Fed. App'x at 746;

having other employees monitor plaintiff's work, Tapia v. City of Albuquerque, 170 Fed. App'x.

529, 534 (10th Cir. 2006); unrealized threats of future discipline, id.; negative performance

evaluations, Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 739 (7th Cir. 2006); a "letter of

concern" placed in the plaintiff's personnel file, Ribando v. United Airlines, Inc., 200 F.3d 507, 511

(7th Cir. 1999); a memorandum regarding absences placed in plaintiff's personnel file,  Graham v.

State Farm Mut. Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999); and restrictions on tardiness and

requiring a doctor's note for unexcused absences, Cole v. Powell,  605 F.Supp.2d 20, 26 (D.D.C.

2009).

       In this case, the recording of unscheduled absence information in AutoTA was not materially

adverse.  McCully identifies no way in which this action affected her salary, benefits, or working

---

[29]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See
Fed. R. App. 32.1: 10th Cir. R. 32.1.

conditions.   The information was not inaccurate, nor was it being recorded for McCully only.[30]

More significantly, it was never used.  It is undisputed that McCully's absences were not a factor in her termination.  The fact that the number of unscheduled absences could potentially have a negative effect in the future does not make the recording itself an adverse action.  In <u>Haynes v. Level 3 Communications, LLC</u>,  456 F.3d 1215, 1224 (10th Cir. 2006) (Title VII case), the Tenth Circuit held that a written warning could be an adverse employment action "only if it effects a significant change in the plaintiff's employment status."  In that case, the warning was not adverse because did not have any immediate effect on the plaintiff's employment status.  The same is true in this case. The recording of McCully's unexcused absences in AutoTA had no effect on McCully's employment and, thus, was not adverse.  This determination comports with the Seventh Circuit's decision on a similar set of facts.  In <u>de la Rama v. Ill. Dept. of Human Svcs.</u>, 541 F.3d 681, 685-86 (7th Cir. 2008), that court held that notations of unauthorized absences in the plaintiff's personnel file did not constitute a material adverse action because the plaintiff had not suffered any consequences from those notations.  Further, AA articulated a legitimate, nondiscriminatory reason for recording absence information in the C23s, and McCully has failed to provide evidence from which pretext could be inferred.  <u>See</u> Part III.A.1.b, <u>supra</u>.

AA is entitled to summary judgment on McCully's retaliation claim based on the C23s because McCully cannot establish the second element of her prima facie case; the recording of unscheduled absences in AutoTA was not an adverse employment action.   Further, McCully has failed to show that AA's proffered reason for this action is pretextual.  <u>See</u> <u>id.</u>

---

[30]    Three other employees had C23 entries with comments similar to McCully's. Dkt. # 17-3, at 63-69.

3.     Termination

McCully alleges that she was terminated for complaining about the discriminatory use of C23s and the change in her job duties.  AA does not dispute that McCully has established the first two elements of a prima facie case.  AA argues that McCully cannot establish a causal connection between her FMLA leave or complaint about the C23s and her termination, and that it terminated her for a legitimate, nondiscriminatory reason.

It is clear that the complaint was the event that precipitated McCully's termination.  The parties dispute whether it was the content of her complaint, or the revelation that she accessed other employees' C23s and Ruhl's pay change, that prompted the termination.  McCully has shown a causal connection sufficient to satisfy the third element; it is clear that without the complaint, McCully would not have been terminated.

AA has, however, articulated a legitimate, nondiscriminatory reason for this termination.  See Part III.1.c, supra. McCully argues that this is pretextual.  However, McCully has failed to show pretext in the FMLA context for the same reasons she has failed to show pretext in the ADA context.  See id.  For these reasons, AA is entitled to summary judgment on McCully's FMLA claims.

E.     Breach of Contract

McCully alleges that she and AA entered into a contract, namely the AA "Code of Conduct," and that AA breached this contract by: failing to properly consider harassment against her; demoting her; and suspending and then terminating her when she complained of being discriminated against.  Dkt. # 2, at 9.  She also argues that AA breached various policies by: ignoring "what was required before comments were recorded in the C23;" separating the investigation of her termination and her discrimination complaint; effecting reprisals for her reporting unethical behavior; and closing her

discrimination complaint without considering her intermittent FMLA leave claim. Dkt. # 31, at 37.

AA argues that it is entitled to summary judgment on this claim because McCully was an at will employee, and that neither the Code of Conduct nor any other document or policy restricts its ability to discharge its employees. Dkt. # 17, at 40.

Oklahoma follows the doctrine of employment-at-will, which means that an employer may discharge an employee for any reason, even without cause, at any time. Hayes v. Eateries, Inc., 905 P.2d 778, 781 (Okla. 1995). "However, the employment-at-will doctrine has been judicially limited by exceptions that restrict the grounds on which an at-will employee may be discharged." Id. at 781-82. These exceptions include the Burk tort, see Part III.F, infra, and breach of contract. Hayes, 905 P.2d at 781. Express or implied contracts can alter an employee's status from at-will. Vice v. Conoco, Inc., 150 F.3d 1286, 1288-89 (10th Cir. 1998) (applying Oklahoma law).

Oklahoma looks to five factors to determine whether an "implied contract right to job security exists." They are:

1.      Separate consideration beyond the employee's services to support the implied term;

2.      Longevity of employment;

3.      Employer handbooks and policy manuals;

4.      Detrimental reliance on oral assurances, pre-employment interviews, company policy and past practices; and

5.      Promotions and commendations.

Hinson v. Cameron, 742 P.2d 549, 554 (Okla. 1987); see also Vice, 150 F.3d at 1289; Black v. Baker Oil Tools, Inc., 107 F.3d 1457, 1461 (10th Cir. 1997); Hayes v. Eateries, Inc., 905 P.2d 778, 782 (Okla. 1995) (each applying the Hinson factors to determine whether plaintiff had an implied

contractual right to continued employment). Normally, the existence of an implied contract is a factual question. Hayes, 905 P.2d at 783. However, "if the alleged promises are nothing more than vague assurances . . . the issue can be decided as a matter of law." Id.; Vice, 150 F.3d at 1289.

In this case, only the third factor is relevant. McCully does not argue that the first, second, fourth, or fifth factors exist or created an implied contract in her case. She does, however, argue that AA handbooks and policy manuals created an implied contract. An employer's handbook or manual can, in some circumstances, be a sufficiently concrete promise to create an implied contract that limits an employer's ability to terminate an employee. However, the handbook or manual must place "substantive restrictions" on the employer's power to discharge the employee. Hayes, 905 P.2d at 783. For example, while "practical advice," "guides," or lists of some of the reasons an employee may be terminated do not create substantive restrictions, e.g., Vice, 150 P.3d at 1289 ("[t]his book has been designed to give you practical advice about how to handle various situations"); Hinson, 742 P.2d at 557 (manual listing some grounds for termination), a guarantee that employees will not be terminated on the basis of physical handicap does, Baker Oil, 107 F.3d at 1461-62.

In this case, McCully argues that the Code of Conduct and the "unlawful harassment policy" prohibit retaliation for reports of unethical conduct. However, McCully points to no specific language in any policy that states an employee will not be fired for reporting discrimination, nor can the Court find any. The harassment policy states that "reports of unalwful harassment or hate-related behavior may be made to any supervisor or manager . . . or anonymously to The Network ReportLine." Dkt. # 31-24, at 2. The Code of Conduct states that "the core of the Code of Conduct is contained in seven general rules." Dkt. # 31-25, at 1. The fourth rule is "Conduct yourself with

the highest standards of honesty, integrity, and fairness when dealing with . . . other employees." The fifth rule is "promptly alert the Business Ethics Office if you are aware of, or suspect in good faith any illegal act by an employee or representative of the company."[31] It also says that employees should contact the Business Ethics Office or The Network ReportLine if they suspect a violation of the Code of Conduct. The "Do the Right Thing" document submitted by McCully states "the company will not tolerate retaliation or retribution against any employee who reports a concern." Dkt. # 31-28.

None of these statements rises to the level of a specific restriction sufficient to create an implied contract. The guarantee in <u>Baker Oil</u>, 107 F.3d at 1462, was far more explicit. It stated, "all relations and decision pertaining to employment . . . [and] terminations . . . will be executed without regard to . . . physical . . . handicap." In contrast, AA did not guarantee that an employee's discrimination complaint would never be the basis of an employment decision. McCully has identified no document that places substantive restrictions on AA's ability to terminate its employees.[32]

McCully also argues that AA breached a policy by not combining the investigation of her C23 access and her discrimination complaint. However, her only evidence of such a policy is Forbes' statement that "'normally' discrimination complaints are treated as one investigation even if they have different subparts." Dkt. # 31, at 37. This is not evidence of a policy regarding

---

[31]     The next general rule is "Cooperate fully in any investigation of misconduct." Dkt. # 31-25, at 1.

[32]     McCully's suggestion that the C23 instructions created an implied contract fails. The instructions do not give substantive rights to employees. Further, McCully has not alleged that she was, in fact, adversely affected by the C23 entries.

investigation of terminations and discrimination complaints, much less of a policy that places substantive restrictions on AA's ability to terminate employees.

Even if these documents and policies created a contract, they would not restrict AA's right to terminate her for improperly accessing other employees' confidential records. Since McCully has failed to provide evidence that she was fired for any other reasons, <u>see</u> Parts III. A, B, C, D, <u>supra</u>, she cannot claim that any contract has been breached.

F.    <u>Violation of Oklahoma Public Policy</u>

McCully alleges that AA violated Oklahoma's public policy against employment discrimination on the basis of disability and/or perceived disability when it terminated her. Dkt. # 2, at 9. In <u>Burk v. K-Mart Corp.</u>, 770 P.2d 24 (Okla. 1989), the Oklahoma Supreme Court recognized a limited exception to the at-will employment doctrine and permitted a discharged employee to pursue a tort claim if she "is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." <u>Id.</u> at 29. In <u>Saint v. Data Exchange, Inc.</u>, 145 P.3d 1037 (Okla. 2006), the Oklahoma Supreme Court confirmed that the OADA created a unified class of individuals who are the victims of "handicap, race, gender, or age discrimination," and equal remedies are required for all such individuals. <u>Id.</u> at 1038. However, the OADA itself provides a statutory remedy for victims of disability discrimination. The purpose of the <u>Burk</u> tort is to give victims of <u>other</u> discrimination the same remedies available to the victims of disability discrimination. Thus, a <u>Burk</u> tort may be unavailable to a victim of disability discrimination.[33] <u>Cf.</u> <u>id.</u> ("if the [OADA] had afforded the

---

[33]    McCully could not bring a <u>Burk</u> claim based on entitlement to FMLA leave because persons entitled to FMLA leave are not within the class of discrimination victims described in <u>Saint</u>. 145 P.3d at 1038.

victims of sexual harassment the same remedies as given to handicap-discrimination victims, the Burk tort would not be available") (citing Collier v. Insignia Fin. Corp., 981 P.2d 321, 326 (Okla. 1999)).

Ultimately, the Court need not determine whether a Burk tort is available to alleged victims of disability discrimination, because McCully cannot establish that she has been discriminated against. The Tenth Circuit has repeatedly recognized that a plaintiff's failure to establish federal discrimination claims is equally dispositive of Burk claims. E.g., Brown v. Bd. of Regents, No.09-6063, 2009 WL 4194299, at *3 (10th Cir. Nov. 30, 2009) (unpublished);[34] Ruleford v. Tulsa World Publ'g Co., 266 Fed. App'x 778, 784 (10th Cir. 2008) (unpublished); Smith v. Okla. ex rel. Tulsa County Dist. Attorney, 245 Fed. App'x 807, 818 (10th Cir. 2007) (unpublished); Malone v. MAPCO, Inc., No. 91-5073, 1992 WK 26788, at *1 (10th Cir. Feb. 11, 1992) (unpublished). The same is true here. AA is entitled to summary judgment on McCully's Burk tort claim.

For these reasons, AA is entitled to summary judgment on each of McCully's claims

**IT IS THEREFORE ORDERED** that Defendant American Airlines, Inc.'s Motion for Summary Judgment & Brief in Support (Dkt. # 17) is **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that the parties' pending motions in limine (Dkt. ## 24-29) are **moot**, and the pending Joint Application to Continue and Reschedule Trial Date (Dkt. # 49) is **moot**.

**DATED** this 3rd day of March, 2010.

_Claire V Ea__

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[34]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.